### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| KATRINA BRADFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. |
| | ) 2:13-CV-00642-KOB |
| REGIONS FINANCIAL | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

This employment discrimination matter, asserting discriminatory termination under the ADA as amended, is before the court on the "Defendant's Motion for Summary Judgment." (Doc. 27). This matter has received thorough briefing: the Defendant filed a brief (doc. 28) and supporting evidentiary material (doc. 29); the Plaintiff filed an opposition brief (doc. 35) which was corrected (doc. 36); and the Defendant filed a reply (doc. 37). For the reasons stated in this Memorandum Opinion, the court WILL GRANT the motion, and will ENTER SUMMARY JUDGMENT in favor of the Defendant and against the Plaintiff on the remaining ADA claim.

### PROCEDURAL HISTORY

The Plaintiff, Katrena[1] Bradford, filed this suit on April 8, 2013, asserting two claims against her employer, Regions Bank: an ADA disability discrimination claim based on her termination; and a claim for race discrimination. On May 9, 2013, Regions filed the first dispositive motion, requesting the court to dismiss the race discrimination claim in Count II. The

---

[1] Although the Complaint spells the Plaintiff's first name "Katrina," the court notes that the Plaintiff's brief and various work and medical documents spell her name "Katrena."

1

court granted this motion, finding that Bradford had failed to plead sufficient facts demonstrating that Regions discriminated against her on the basis of race. (Docs. 14 - Memorandum Opinion & 15 - Order). Regions subsequently filed a second dispositive motion, the motion for summary judgment currently under submission, on the remaining count for disability discrimination.

## FACTS

*Bradford's Employment with Regions*

Defendant Regions hired Plaintiff Bradford in 1982. At the time of the employment decision made the basis of this suit, Bradford worked as a Lockbox Services Product Lead, a service Regions uses that allows Regions to receive and process payments for goods that its customers sell. Her job was primarily computer-based, and approximately 90% of her duties, including data entry and product implementation, required Bradford to sit at a desk and use her computer for six-to-eight hours per day. Bradford's department was comprised of two employees, the lead, Bradford, and one additional employee, Melissa Beatty, who was the Lockbox Implementation Analyst. Because Bradford was the lead person in her department, she represented the main point of contact for lockbox customers and salespersons. The position was a full-time position with normal business hours, Monday through Friday. Bradford's supervisor was Pallas Garrett, Regions' Treasury Management Implementation Team Lead.

*Bradford's Relevant Medical Conditions*

In 2010, Bradford's physicians determined that her kidneys were functioning at a diminished capacity, and they began monitoring her kidneys. On December 19, 2011, Bradford was admitted to the hospital and, in connection with that hospitalization, doctors determined that she had suffered a heart attack and was in renal failure. On December 27, 2011, Bradford

underwent coronary artery bypass surgery and was hospitalized for approximately two weeks; the medical certification eventually submitted to Regions lists her admissions in a hospital or residential care facility as December 19-25, 2011 and December 26, 2011-January 6, 2012. In December of 2011, she also began kidney dialysis three times a week.

*Regions FMLA Leave*

Regions' leave policy, which Bradford certified annually that she had read, allows employees to take up to 180 days of leave per year. The 180 total leave days may include up to 12 workweeks of unpaid, job-protected *FMLA leave,* and employees may also apply for up to 90 days of discretionary *personal leave* following and in addition to FMLA leave. In addition to the 180 total days of leave, Regions sometimes allows additional leave days as an accommodation.

Because of the emergency nature of Bradford's hospitalization in late December of 2011, Bradford had not submitted a request for FMLA leave ahead of time. Ginger Boland in Regions' Leave of Absence Department first learned of Bradford's absence from work and hospitalization on Tuesday, January 3, 2012. Boland attempted to contact Bradford at the hospital but was unable to do so, so she placed her on leave effective December 27, 2011, the date of her surgery. Subsequently, on January 5, 2012, Boland wrote Bradford, advising her that she must submit a medical certification to take FMLA leave by a January 20, 2012 deadline. Bradford did not submit the certification by the deadline, so Regions initially denied her leave request. Boland subsequently gave Bradford a month-and-a-half extension to submit the medical certification, but Bradford failed to submit the certification by the extended deadline.

On March 7, 2012, 47 days after the medical certification deadline, Bradford finally submitted the medical certification by Richard Lyerly, M.D., dated March 1, 2012. It stated that

Bradford "is still recovering from Coronary Artery Bypass Surgery," and mentioned that she was undergoing dialysis three times per week.  Dr. Lyerly set the date of Bradford's incapacity as beginning on December 17, 2011 with an indeterminate ending, and checked "no" to the question: "Is the employee unable to perform any of his/her job functions due to the condition."  He indicated that the employee's absence from work "will depend on the problems she experiences with dialysis."  (Doc. 35-2, at 26-27).

     Bradford submitted to Regions a form dated in February 23, 2012 entitled "Additional FMLA Responsibilities," stating that she intended to return to work.  In the form, she placed initials inside each box on the form, indicating that she understood the information inside initialed boxes, including the following information: "If the need for leave extends beyond Family and Medical Leave, you will no longer have job protection and employment may be terminated."  (Doc. 35-1, at 19).  Bradford signed the FMLA form under the words: "In signing this form in the space provided below, I (the associate) certify that I understand and accept the policy concerning Family and Medical Leave Act as summarized above."  The form also provided a space for the signature of the Department Manager.  Garrett signed the FMLA leave document, confirming that the employee she supervised had requested FMLA Leave.

     In a notice dated March 12, 2012, Regions advised Bradford that it had approved her FMLA leave, beginning December 27, 2012 and continuing until March 19, 2012.  The date of this notice was only one week before the 12-week FMLA leave was exhausted.  The notice form contained an "x" in the box next to the following paragraph:

> You will be required to present a fitness-for-duty certificate to be restored to employment.  If such certification is not timely received, your return to work may be delayed until certification is provided. . .

(Doc. 29-5, at 7).

*Personal Leave*

On March 12, 2012, Boland informed Bradford by separate letter that her last day of protected FMLA leave was March 19, 2012, and that, pursuant to Regions' policy, if she wished her leave to continue, she must submit by March 27, 2012 personal leave paperwork, including a personal leave application and a medical certification from her health provider, both of which were attached. Boland's letter informed Bradford that, during personal leave, "*there is no job protection*. . . .In the event that your position is filled and you are released to return to work then it would be your responsibility to apply for any open position." (Doc. 29-5, at 8). Regions' handbook cautions employees not to "assume that leave will be continued," and that "[i]f you do not submit the required additional paperwork, you will be considered to have voluntarily resigned." (Doc. 29-3, at 19). Regions' attendance policy states that employees who fail to return to work after a leave of absence without proper notice will be considered to have abandoned the job and to have voluntarily resigned. The policy also provides that the disciplinary action for a fourth unexcused absence is termination of employment. (Doc. 29-3, at 27).

In her responses to Regions' Requests for Admissions, Bradford denied receiving the personal leave application from Boland. However, in her deposition testimony, Bradford acknowledged receiving it and stated that she mailed the completed leave application back to Regions sometime after March 15, 2012, but she does not know the date of mailing it back and she has no documentation supporting her claim that she completed it and mailed it to Regions. She did not send it registered or certified mail or otherwise request tracking information. *No dispute exists that Regions never received Bradford's personal leave application.*

5

In a "Designated Notice" letter dated March 29, 2012, ten days after the deadline to submit Bradford's personal leave request and supporting certification, Boland notified Bradford that her personal leave was denied because Regions had not received her leave application nor had it received at that time the related health certification. Boland also notified Bradford that Regions' normal attendance rules would apply to her absence. The notice provided Boland's number to call with questions.

Bradford acknowledged receiving this designated notice, and she also acknowledged that she did *not* submit a personal leave application *after* receiving it. She does not have a specific recollection of speaking to a live Regions person, as opposed to an answering machine or voicemail, after receiving the March 29, 2012 designated notice. She acknowledged: "The thing is, I didn't call them back timely." (Doc. 29-2, at 53).

Garrett, Bradford's supervisor, contacted Boland on April 23, 2012 to discuss Bradford's status. Boland told Garrett that she had not spoken to Bradford. The only updates on Bradford that Regions has a record of having received as of April 23, 2012 were generated from Unum Life Insurance Company of America, the company handling Bradford's disability insurance. Those updates are dated February 8, 2012 (attaching a copy of a letter to Bradford extending short-term disability benefits through March 22, 2012 and giving information regarding medical information needed to obtain a further extension); March 16, 2012 (attaching a copy of a letter to Bradford thanking her for providing information to extend short-term disability benefits); April 20, 2012 (requesting Bradford's job description from Regions and attaching letter to Bradford extending short-term disability benefits through May 27, 2012 and advising her of the approaching end of short-term disability benefits and upcoming consideration for long-term

disability benefits). (Doc. 35-2, at 1-21). Regions sent the requested job description to Unum on April 23, 2012. The Unum updates do not include specific information regarding Bradford's medical condition and/or ability to perform work tasks; they do not attach medical records, letters from doctors, or specify the nature of Bradford's disability. Rather, the Unum updates simply documented notification from Unum to Bradford about extensions of her short-term disability benefits, acknowledge receipt of documents from her, and notify her of her obligation to provide documents in support of her disability requests.

In late April of 2012, Garrett then met with her own manager, Sean Payne, and HR Generalist Stacey Rowland to discuss how to proceed with Bradford's work status. Because the Lockbox department was such a small one, Beatty, the only other department member, had been working both jobs since the end of December; Beatty's combining of the two jobs had resulted in overtime nearly every week, with a total of 27.75 overtime hours logged during Bradford's leave. On April 25, 2012, Rowland and Payne decided to discharge Bradford and fill her position because she had failed to return to work for over a month after the expiration of her FMLA leave, and because Regions had not received personal leave paperwork to extend the leave. On that same date, Rowland called Bradford to discuss her job status. Bradford did not answer, so Rowland left a voicemail message. When Bradford did not return Rowland's call, Rowland called Bradford again on April 30, 2012 and left a second message. Bradford did not return Rowland's April 30, 2012 call.

On May 3, 2012, over a month from the March 27, 2012 deadline to request person leave, Boland finally received Bradford's medical certification for personal leave but received no personal leave application from Bradford. The certification from Dr. Lyerly referred to renal

disease and dialysis and stated: "She has not made sufficient recovery to return to work and it is doubtful that she will." The doctor also stated that "Yes" to the question: "Is the employee unable to perform any of [her] job functions due to the condition," explaining "unable to sit for long period. Still debilitated from her heart surgery." When asked to describe other relevant medical facts, the doctor stated "in addition ot her debility from her surgery, she has End Stage Renal Disease, requiring ... dialysis 3x weekly." (Doc. 35-1, at 2-3, Ex. 26 to Bradford's Dep.). Bradford acknowledged that the medical information on this form was accurate. (Doc. 29-2, at 129-132). Boland then called Bradford and left a message advising her that her personal leave was still denied because no personal leave application had been submitted. Bradford did not return that May 3, 2012 call.

Also on May 3, 2012, Boland emailed Garrett, Bradford's supervisor, updating her on Bradford's situation, including the fact that she had received medical certification for Bradford's personal leave but not Bradford's personal leave application. She asked Garrett to advise her if Garrett took disciplinary action against Bradford for her absence from work. Garrett responded to the email that same day, asking for confirmation that the document Garrett had received from Bradford on March 15 was *not* the personal leave application Boland was missing, and also asking for confirmation that she was free to replace Bradford's position. That afternoon, Boland responded to Garrett, stating that the document Garrett had received and forwarded was Bradford's form for FMLA leave, not one relating to personal leave. Boland stated that "[a]s of today, she has not been terminated," but she confirmed that Garrett could post Bradford's Lockbox position because her FMLA leave had been exhausted. (Doc. 35-1, at 10-11).

*Bradford's Termination*

In a letter dated May 4, 2012, Rowland wrote to Bradford, notifying her that she was being discharged effective that date for job abandonment. The letter indicated that she would receive COBRA information from the benefits department and also stated: "You were notified on March 29, 2012, that your personal leave had been denied and you would be subject to normal attendance guidelines. Several attempts were made to contact and you did not respond." Rowland testified that she actually sent the letter on May 8, 2012 for overnight delivery by Federal Express. Handwritten on the letter is "Received 4/9/12 9:00 AM." (Doc. 35-1, at 5, Exhibit 28 to Bradford's Dep.). Rowland testified that, prior to her deposition, she had not seen Dr. Lyerly's May 1 medical certification, meaning that she had not seen that document at the time she sent the termination letter to Bradford.

On May 8, 2012, Regions' Benefits Department wrote Bradford a letter regarding "Continuation of Regions Financial Corporation Benefits While on Leave of Absence," stating that company "records indicate that you are currently on a leave of absence," and advising her to maintain benefit coverage on leave, she "must continue to make premium payments during your leave of absence." The letter provided an address for sending the premium payments and a May 22, 2012 deadline. (Doc. 35-2, at 23). The Benefits Department sent the letter because department staff were unaware of Bradford's termination; Bradford's benefits were still active in Regions' computer system as the HR department had not yet submitted Bradford's termination paperwork.

On May 9, 2012, after receiving the termination letter, Bradford called Rowland and left a voicemail message. The Regions Human Resources recorded Bradford's call, and the following

9

email was sent to Rowland and Boland: "Good morning, Katrena received her termination letter this morning and called. She said she has left multiple messages for Ginger and has been in touch with Unum. She also said the doctors office has faxed in information. Good luck with this... Let me know if you need anything." (Doc. 35-1, at 8). On Friday, May 11, 2012, an email from Boland's assistant to Rowland and a member of the Regions Human Resource department stated that the assistant had pulled Boland's voicemails during the last week and had found no voicemail messages from Bradford to Boland. Over the next week, Rowland and Bradford exchanged voice messages on four or five occasions but never spoke to each other. On May 15, 2012, Rowland made a final attempt to contract Bradford on both her cell phone number and her home number, but was unsuccessful. Bradford did not return the voicemail messages Rowland left on May 15.

As a result of the termination of her job, Bradford's health insurance through her employment was cancelled. However, she testified in her deposition that she received health insurance through COBRA. She accepted charity from the Kidney Foundation to pay for health insurance premiums through COBRA so that her dialysis could continue.

*Bradford's Medical Condition at the Time of Discharge*

Bradford admits that she was physically unable to perform her job when she was discharged, that she remains physically unable to work, and that her doctor has not yet released her to return to work. Since mid-December of 2011, she has received dialysis treatments three days a week, Mondays, Wednesdays, and Fridays for four hours a day. After treatments, she must generally go home and sleep because the treatments cause her to be physically drained, dizzy, and nauseated, and she acknowledges being unable to predict whether she could come to

work at all on those three weekdays. She acknowledges that she could not sit or use a computer for long periods of time, both of which are requirements for performing her job, and that she could not use three of her fingers on one hand. Prolonged computer use causes arm pain and numbness. Dr. Lyerly's medical certification confirms her physical inability to return to work. Bradford is on the inactive list for a kidney transplant.

*Accommodation*

Regions' ADA Policy requires employees to notify HR and submit medical documents if they need an accommodation for a medical condition. Bradford admits that she never requested any accommodation that would have allowed her to return to work and acknowledges that she never discussed the possibility of returning to work with Garrett, Boland, or someone from the HR department nor did she ever specifically request that her job duties or work schedule be modified so that she could return to work. Further, she never specifically requested to be able to work from home.

*Bradford's Disability Claims*

Bradford has received awards of disability benefits from Unum Insurance Company and the Social Security Administration. In applying for those disability awards, Bradford admitted that she was completely unable to return to work because of her medical disability. In her social security case, Bradford represented that she has been completely unable to work because of her disability since December 19, 2011, and she received benefits with that onset date.

## **LEGAL STANDARD**

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)  Substantive law determines which facts are material and which are irrelevant. *Id*. at 248. In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324). If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-

moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## DISCUSSION

Bradford brings this claim for disability discrimination under the ADA as amended by the ADAAA. She claims that Regions discriminated against her in terminating her because of her medical condition and failed to provide reasonable accommodation for that condition.

Where, as here, no direct evidence of discrimination exists, the court first analyzes an ADA case under the *McDonnell Douglas* burden-shifting framework. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). To establish a *prima facie* case under the ADA as amended by the ADAAA, a plaintiff must show that she had a disability, that she was a qualified individual, and that her employer subjected her to unlawful discrimination because of her disability. *See Mazzeo v. Color Resolutions Inter., LLC,* 746 F.3d 1264, 1268 (11th Cir. 2014) (listing those

elements).

In the instant case, Regions asserts that Bradford cannot meet her *prima facie* case because she cannot prove that she is a qualified individual as the ADA defines that term. To establish the "qualified individual" element, Bradford "must show either that [s]he can perform the essential function of h[er] job without accommodation, or, failing that, show that [s]he can perform the essential function of h[er] job with a reasonable accommodation." *See Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000). If the employee "is unable to perform an essential function of [her] ... job, even with an accommodation, [s]he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Id.* The ADA's implementing regulations define "essential functions" of a job as "'the fundamental job duties of the employment position the individual with a disability holds or desires,' and 'does not include the marginal functions of the position.'" *D'Angelo v. ConAgra Foods, Inc.,* 422 F.3d 1220, 1230 (11 th Cir. 2005) (quoting 29 C.F.R. § 1630.2(n)(1)).

In the instant case, the court need not spill much ink in the analysis of whether Bradford can perform the essential function of her job, and thus, is a qualified individual under the ADA. Bradford offered no evidence that, at the time of her discharge, she could perform the essential functions of her job which were data entry and product implementation and required the employee's sitting at a desk and using a computer for most of the work day. In fact, in her deposition testimony, Bradford acknowledged that she was not capable of performing those work duties at the time of her termination in May of 2012, nor was she capable of performing them at the date of her deposition in January of 2014. She reiterated this acknowledgment in her submissions to the Social Security Administration and to her disability insurance carrier,

asserting that she was unable to work.

Bradford's doctor's certification dated May 1, 2011 also confirms Bradford's testimony that she was unable to work, stating: "She has not made sufficient recovery to return to work and it is doubtful that she will."  The doctor also stated  "Yes" to the question: "Is the employee unable to perform any of [her] job functions due to the condition," explaining "unable to sit for long period.  Still debilitated from her heart surgery."  When asked to describe other relevant medical facts, the doctor stated "in addition to her debility from her surgery, she has End Stage Renal Disease, requiring ... dialysis 3x weekly." (Doc. 35-1, at 2-3).

Bradford further acknowledged her inability to work with any reliability on the days she undergoes kidney dialysis, which occurs each Monday, Wednesday, and Friday.  She testified that the dialysis takes four hours per dialysis day and that the process often leaves her physically drained, dizzy, nauseated, resulting in her inability to predict whether she could work during the afternoon after dialysis treatment.

This judge agrees with the esteemed Judge Bill Acker, who explained: "It goes without saying that one of the essential functions of any job is attendance." *Butler v. Personnel Bd. of Jefferson Cty.,* No. 07-CV-652, *22-23 (N.D. Ala. May 27, 2008) (finding that the requested accommodations were unreasonable as a matter of law because they would not have allowed the employer to predict with any certainty when the plaintiff would be at work); *see also Gore v. GTE South, Inc.,* 917 F. Supp. 1564, 1572 (M.D. Ala. 1996) (finding that the plaintiff's "sporadic and unpredictable" work absences meant that she was not a "qualified individual" within the meaning of the ADA; and collecting other district court decisions holding "as a matter of law that excessive, sporadic and unpredictable absenteeism is not subject to reasonable accommodation

by the employer and that the employee is accordingly not 'qualified' under the appropriate statute").

Given Bradford's testimony that she is unable to work with any reliability on three out of the five days per work week, the court finds that she has not established that she could perform the essential functions of her job without accommodation. Indeed, the court is not convinced that, given the evidence of unpredictability of her ability to perform work on dialysis days, that any accommodation to her disability would be available and reasonable that would allow her to perform the essential functions of her job.

In any event, the plaintiff bears the dual burden of identifying an accommodation and of showing that it is reasonable. *See Willis v. Conopco, Inc.,* 108 F.3d 282, 283 (11th Cir. 1997) (per curiam). Further, the plaintiff bears the burden of establishing that she has made a request to the employer for an accommodation; the Eleventh Circuit has concluded that a claim based upon a failure to provide reasonable accommodation must fail if the plaintiff never requested it. *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir. 1999).

In the instant case, the evidence reflects that Bradford never made a request to Regions for an accommodation, and she certainly has not met her dual burden of identifying an accommodation and showing that the accommodation is reasonable. For all of these reasons, the court FINDS that Bradford has not established that she is a qualified individual within the meaning of the ADA, and thus, she has not established her *prima facie* case under the *McDonnell Douglas* framework for an ADA claim.

The court acknowledges that the "convincing mosaic" of circumstantial evidence set out in *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011) represents yet another

way for Bradford to attempt to defeat the Defendants' motion for summary judgment. However, Bradford makes no arguments under *Lockheed-Martin,* and she has the burden to connect the mosaic tiles; the court need not attempt to piece together a mosaic when she has not done so.

Accordingly, the court FINDS that Regions' motion for summary judgment is due to be GRANTED, and it will enter a separate Order to that effect simultaneously with the filing of this Memorandum Opinion.

Dated this 20th day of January, 2015.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE